# IN THE SUPREME COURT OF TEXAS

No. 19-0334

BROADWAY NATIONAL BANK, TRUSTEE OF THE MARY FRANCES EVERS TRUST, ET AL., PETITIONERS,

v.

YATES ENERGY CORPORATION, EOG RESOURCES, INC., JALAPENO CORPORATION, ACG3 MINERAL INTERESTS, LTD., GLASSELL NON-OPERATED INTERESTS, LTD., AND CURRY GLASSELL, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

JUSTICE BUSBY, joined by JUSTICE GUZMAN, JUSTICE LEHRMANN, and JUSTICE BLACKLOCK, dissenting.

Deeds conveying real property sometimes contain mistakes. To lessen the need for costly litigation to fix them, the Legislature authorized the parties to a recorded deed to correct an ambiguity or error by agreement if they follow certain rules. But what if the original parties to the deed no longer have any interest in the property? Recognizing the potential for abuse if those who no longer own property can retroactively change what they parted with, the Legislature provided that a material correction "must be . . . executed by each [original] party . . . or, if applicable, a party's heirs, successors, or assigns." TEX. PROP. CODE § 5.029(b).

Today, the Court reads the words "if applicable" out of the statute, allowing the original parties to alter a deed without even giving notice to the assignees who currently own the property. In other words, the Court believes that the Legislature empowered former owners to strip current owners of their property without notice, much less their assent to a correction—that is, without due course of law.

The Legislature did no such thing. The plain language of the statute requires an assign to execute the deed "if applicable," and an assignment made the assignees applicable parties to any correction. If this language were not clear enough, surrounding statutory provisions and common-law principles confirm that an original party who assigned its entire interest cannot defeat the rights of its assignee. The Court's approach is also contrary to the Texas Title Examination Standards and will destabilize our record title system. I therefore respectfully dissent.

## I. The plain language of section 5.029 requires the signature of the owner of the property interest affected by a correction instrument.

As the Court explains, petitioner Broadway Bank (as trustee) conveyed mineral interests to John Evers in fee simple in 2005, and John conveyed the same interests to respondent Yates Energy in 2012. *Ante* at __. Yates Energy then assigned its interests to several parties, including EOG Resources, Inc., who received 70%. *Ante* at __.

In 2013, Broadway Bank and John executed a correction deed showing that Broadway had conveyed only a life estate to John. *Ante* at __. If effective, this instrument would mean that EOG and the other Yates Energy assignees kept their interests only until John died, which he did only a few months after he joined in executing the correction instrument. The question here is whether that correction is effective given that it was signed by Broadway and John, but not by the assignees owning the interests at the time the correction instrument was executed.

2

Section 5.029(b)(1) of the Texas Property Code requires a correction instrument to be "executed by each party to the recorded original instrument of conveyance the correction instrument is executed to correct or, if applicable, a party's heirs, successors, or assigns." Similarly, subsection (a) provides that "the parties to the original transaction or the parties' heirs, successors, or assigns, as applicable may execute" the instrument. TEX. PROP. CODE § 5.029(a). Thus, the Legislature did not conclude that original parties can best correct errors; if it had, it would not have mentioned the parties' heirs, successors, or assigns. The issue before us is when an assignee becomes "applicable" and must execute the correction.

The Court reads these provisions to allow original parties to a conveyance to execute a correction instrument in any event, regardless of whether the original grantee has assigned the property. It sees "[n]othing in this text indicat[ing] that an assign must assent to a correction instrument when each party to the original conveyance is available to correct their mistake by executing a correction instrument." *Ante* at __.

But as Yates argues, the phrase "if applicable" indicates precisely that: it tells us that the assigns of an original party must sign if theirs is the interest affected. The Court reads this phrase merely to "emphasize[]" that an original party's heirs, successors, or assigns "may be relevant when the original party is unavailable and, in that case, may serve as a substitute." *Ante* at __. If that is really what including the phrase "if applicable" tells us, then those words tell us nothing at all. The same result follows if the two words are deleted altogether.

Specifically, if the statute provided that "a correction instrument must be executed by each original party or by a party's heirs, successors, or assigns," we would reach the same result the Court reaches today. That is, the heirs, successors, or assigns could serve as substitutes for the

3

original parties when the original parties are unavailable. We do not need the phrase "if applicable" to tell us this because the "or" already does so. The assigns are potential substitutes even if the phrase "if applicable" is absent, so the Court effectively reads that phrase out of the statute. Because the Legislature has included the phrase "if applicable," we must give effect to it as part of the entire statute, treating none of its language as surplusage. TEX. GOV'T CODE § 311.021(2); *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000).

The Court not only reads out some of the words chosen by the Legislature, it rewrites others, changing "an assign must execute if applicable" to say "the original party must execute unless it is no longer available."[1] But in the actual text of the statute, "applicable" modifies assign—not original party—and there is no mention of availability. Who must execute the correction instrument turns on the applicability of the assigns, not the availability of the original parties.

Read as a whole, the statute not only presents two alternatives, it tells us when to choose each. The use of "or" here signals a compound subject (original parties or their heirs, successors, or assigns). As there is a single predicate (must execute the correction), it attaches to each subject alternatively. Consider the Speedy Trial Act, which formerly read: "[t]he failure of a defendant to move for discharge under provisions of this article prior to trial or the entry of a plea of guilty constitutes a waiver of the rights accorded by this article."[2] Courts noted that "failure" and "entry"

---

[1] *Ante* at __ (concluding assign may serve as substitute "when the original party is unavailable"); __ (explaining statute permits assign to sign correction "if the original party is unavailable").

[2] Act of May 20, 1977, 65th Leg., R.S., ch. 787, § 1, 1977 Tex. Gen. Laws 1970, *amended by* Act of Feb. 14, 1979, 66th Leg., R.S. ch. 3, § 1, 1979 Tex. Gen. Laws 4, *amended by* Act of May 22, 1987, 70th Leg., R.S., ch. 383, § 2, 1987 Tex. Gen. Laws 1885, *repealed by* Act of May 19, 2005, 79th Leg., R.S., ch. 1019, § 2, 2005 Tex. Gen. Laws 3464.

were "compound subjects" and that the right to a speedy trial could be waived in two ways: defendants could waive the right by failing to move for discharge, or defendants could waive the right by entering a guilty plea. *Martinez v. State*, 646 S.W.2d 483, 485 (Tex. App.—Houston [1st Dist.] 1982, no pet.) (citing *Wooten v. State*, 612 S.W.2d 561 (Tex. Crim. App. 1981)).

*Martinez* reminds us that for compound subjects connected by "and" or "or," the predicate attaches to each of the subjects. This grammatical function makes it unnecessary to write out the predicate twice when the same idea can be expressed in fewer words by writing it only once. The Legislature relies on that function here by using a compound subject with a single predicate. *See* TEX. PROP. CODE § 5.029(b)(1). Given the Court's detailed discussion of the meaning of this statute, it is worth scrutinizing the compound subject it relies on to convey its meaning. Considering the use of that compound subject, the statute can be literally read: a correction instrument must be executed by each party to the recorded original instrument of conveyance the correction instrument is executed to correct or, if applicable, a correction instrument must be executed by a party's heirs, successors, or assigns.

The only difference between this reading and the codified version is that the codified version takes a grammatical shortcut with no loss in meaning. Simpler sentences illustrate the concept better. Instead of writing, "John will pick you up from the doctor, or Mary will pick you up from the doctor," we might use a compound subject: "John or Mary will pick you up from the doctor." These sentences say the same thing using the same words, but the compound subject keeps some of these words from being repeated, even when the meaning of these words attaches to both subjects.

Section 5.029 tells us that one of two things will happen: either the original parties must execute the correction instrument, or the assigns of an original party must execute the correction instrument instead of that party. The Court says that the original parties must do so if they are available and if not, the assigns can step in. The Court might be correct if the statute simply provided that either original parties "or" assigns could execute the instrument. Adding the phrase "if applicable," however, tells us that the assigns must sign if they are applicable.

The Court does not ignore the "if applicable" phrase but seeks to define it away, observing that "applicable" means "capable of being applied." *Ante* at __. This definition only confirms what we see in looking at the word: it is derived from the verb "apply" through suffixation. The definition is circular in relying on a root word to define a word derived from that root. Instead, we must know the definition of "apply" to determine what "applicable" means.

In this context, "apply" means "to have relevance or a valid connection."[3] Using this definition in section 5.029(b), we see that the original parties to a conveyance must execute the correction instrument or, if the assigns of an original party have relevance or a valid connection to the conveyance, they must do so in place of that original party. The remaining question is when the assigns of an original party have relevance or a valid connection to the conveyance. The answer must be that this is true when, and only when, the assigns own an interest affected by the correction instrument. In particular, assigns have a connection when the instrument modifies their property interest. When the correction instrument modifies only the property interests of others, the assigns cannot execute it: they have no interest in property held by others and, as explained below, cannot modify such a property interest.

---

[3] *Apply*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/apply (last visited May 4, 2021).

Other statutes with a substantially similar structure confirm this reading. When a statute uses the modal verb "must," a compound subject joined by "or," and a condition introduced by "if applicable" or "as applicable," the statute does not contemplate interchangeable alternatives. Instead, it signals when one alternative applies and, in that event, the other does not.[4] The Court's interpretation applies equally to these statutes, and it makes many of them nonsensical.

---

[4] *E.g.*, TEX. PROP. CODE § 209.015(c) ("An owner must obtain the approval of the property owners' association or, if applicable, an architectural committee established by the association or the association's dedicatory instruments . . . .") (requiring approval first from an architectural committee if there is one); TEX. AGRIC. CODE § 104.002 ("A contract between a producer and a purchaser regarding an agricultural product must clearly and conspicuously state on its face that it is an acreage contract or a quantity contract, as applicable.") (where contract must be for one or the other); TEX. EDUC. CODE § 11.1516(b)(1) ("The Internet website must include district information, disaggregated by campus, grade, sex, race, academic quarter or semester, as applicable . . . .") (where the district runs either on semesters or quarters); *id.* § 12.155 ("The name of a college or university charter school or junior college charter school must include the name of the public senior college or university or public junior college, as applicable, operating the school.") (where the operator can only fall into one of the categories); *id.* § 22.004(h) ("An audited financial statement provided under this section must be made in accordance with rules adopted by the commissioner of insurance or with generally accepted accounting principles, as applicable.") (where on-point rules must be followed if there are any, and generally accepted principles otherwise); *id.* § 44.004(c)(2) ("The notice of a public meeting . . . must show the difference, expressed as a percent increase or decrease, as applicable, in the amounts budgeted for the preceding fiscal year and the amount budgeted for the fiscal year that begins in the current tax year . . . .") (where the difference will be either an increase or a decrease); *id.* § 54.5192(f)(1) ("The ballot proposition for an election to approve a proposed initial fee under Subsection (d) or a proposed fee increase under Subsection (e) must clearly state the amount of the proposed fee or fee increase, as applicable . . . .") (depending on whether a new fee or change to an existing fee is proposed); TEX. GOV'T CODE § 304.004(a) ("Each individual designated must meet age and residence requirements for a senator or representative, as applicable . . . .") (where each individual is designated as an emergency successor either for a state senator or a state representative); *id.* § 304.004(d) ("The secretary of the senate or chief clerk of the house, as applicable, shall promptly deliver a certified copy of each revision [to a legislator's list of emergency successors] and of any accompanying acceptance to the secretary of state.") (depending on whether the legislator is a senator or representative); *id.* § 411.181(a-1) ("The duplicate license must provide for an expiration date, calculated in accordance with Section 411.183(a) or (b), as applicable . . . .") (where subsection 411.183(a) applies to licenses and 411.183(b) to renewed licenses); *id.* § 411.356 ("Before requesting activation of the alert system, a local law enforcement agency must verify that the criteria described by Section 411.355(a) or (b), as applicable, have been satisfied.") (where section 411.355(a) deals with alerts for abducted children and 411.355(b) missing persons with an intellectual disability); *id.* § 659.104(a) ("An authorization for a deduction under this subchapter must direct the comptroller or, if applicable, the appropriate financial officer of an institution of higher education to transfer the withheld funds . . . .") (depending on whether the state agency is an institution of higher education); *id.* § 805.003 ("All payments for service credit reinstated or purchased under section 805.002 must be made before retirement or the first payment of a death benefit annuity, as applicable . . . .") (where payment must precede a death-benefit annuity payment only if death precedes retirement); *id.* § 1371.053(b)(1) ("The obligation authorization must establish: the maximum amount of the obligation to be issued or, if applicable, the maximum principal amount that may be outstanding at any time . . . .") (depending on whether a fixed or open-ended obligation is authorized); TEX. LOC. GOV'T CODE § 242.0015(d) ("Not later than the 30th day after the date the county and the municipality are required to have an agreement in effect under Section 242.001(f), the arbitrator or arbitration panel, as applicable, must be selected.") (where the selection must be a single arbitrator or a panel, depending on what

For example, Broadway relies on section 209.015(c) of the Property Code as support for its reading that "if applicable" introduces a potential alternative but allows either alternative to substitute freely for the other. That section reads: "[a]n owner must obtain the approval of the property owners' association or, if applicable, an architectural committee established by the association or the association's dedicatory instruments." TEX. PROP. CODE § 209.015(c). Under the ordinary rules of grammar laid out above, this statute requires a homeowner to seek approval of new construction or improvements from an architectural committee if there is one. But under Broadway's interpretation, the homeowner is free to seek approval from the property owners' association instead. And under the Court's interpretation, the homeowner must seek approval from the association unless it is unavailable. Neither interpretation is grounded in the plain language of the statute or the dictionary definition of "applicable."

Broadway points to a procedure in the same chapter that allows the board of a homeowners' association to consider appeals from a denial of architectural committee approval. *Id.* § 209.0051(h)(7). To Broadway, this proves that homeowners can seek approval from either the architectural committee or property owner's association: if the association can review the committee's decision, why can the homeowners not start there? This appeals process, however,

---

was agreed to); TEX. SPEC. DIST. CODE § 3792.0501 ("The district must hold an election in the manner provided by Chapter 49, Water Code, or, if applicable, Chapter 375, Local Government Code, to obtain voter approval before the district may impose an ad valorem tax.") (where the election procedures differ for general-law and municipal-management districts); TEX. TRANSP. CODE § 504.305(b) ("The department shall issue license plates for active members of the Texas National Guard or Texas State Guard, retired members of the Texas National Guard or Texas State Guard, and members of a reserve component of the United States armed forces . . . . The license plates must include the words 'Texas Guard' or 'Armed Forces Reserve,' as applicable.") (where plates would read "Texas Guard" for active and retired members of the Texas National and State Guards and "Armed Forces Reserve" for members of a reserve component of the United States armed forces); TEX. CODE CRIM. PROC. art. 24.12 ("The request must be filed with the clerk of the court and must include an affidavit of the attorney representing the state or the defendant, as applicable . . . .") (where an attorney represents one but not both); *id.* art. 38.11(d) ("An application for a subpoena of a journalist . . . must be signed by the elected district attorney, elected criminal district attorney, or elected county attorney, as applicable.") (depending on the title of the attorney representing the state in the matter).

confirms my reading: homeowners must first seek approval from the architectural committee if there is one, and the association can later review the committee's decision. The provision of an appeals process in section 209.0051(h)(7) can only have meaning if this is so.

Section 209.015(c) of the Property Code is just one of many statutes in which the Legislature uses the modal verb "must," a compound subject, and the phrase "if applicable" or "as applicable" to signal that when one alternative is applicable, the other is not. We should follow that reading here. For these reasons, the plain text of section 5.029 shows that an original party's assigns must execute the correction instrument if they are the current owners of property affected by the correction.

## II. An assignor cannot assert any rights it has assigned, so an original grantee of a conveyance cannot divest its assigns through a correction instrument.

Even if section 5.029 were ambiguous, the statutory context and the common law confirm that when an original grantee has assigned its interest, its assignee must execute the correction instrument.

Looking at the correction-instrument scheme as a whole, the Court's reading presents a disturbing anomaly: a current owner of property receives less protection when a material change is made under section 5.029 than when a nonmaterial change is made to correct a clerical error. Section 5.028 allows a party to make nonmaterial changes to a deed by executing a correction instrument without the consent of any other party, but to do so the party must provide notice to the current owner. But there are no notice protections for current owners whose property interest is actually altered by a material change in a correction instrument. Amicus Texas Land Title Association, for example, agrees with Broadway that the original parties can execute a correction

9

instrument under section 5.029 even if one of them has conveyed its interest, but it acknowledges that legislation is necessary to add a notice provision to section 5.029 to protect current owners.

My reading, on the other hand, shows that the lack of a notice provision is no oddity at all: if the current owners of land materially affected by a correction instrument must execute the instrument, there is no gap in the Property Code. Sections 5.028 and 5.029 were enacted in the same bill.[5] Instead of overlooking the need to repeat a notice requirement in a similar, adjacent section so that current owners know when they are being deprived of property, it is far more likely that the Legislature saw no need for such notice in section 5.029 because current owners must execute the instrument.

We also look to the common law for guidance in construing statutes. TEX. GOV'T CODE § 311.023(4). Under the common law, an assignee stands in the shoes of his assignor. *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 571–72 (Tex. 2001). In addition, an assignor loses all control over the property assigned and can do nothing to defeat the rights of its assignee. *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 722 (Tex. App.—Dallas 2004, no pet.) (citing *Univ. of Tex. Med. Branch at Galveston v. Allan*, 777 S.W.2d 450, 453 (Tex. App.— Houston [14th Dist.] 1989, no writ)). Together, these complementary principles confirm that when an assignee is "applicable," the assignor cannot change what it assigned without the assignee's consent.

To illustrate, consider a case in which a hospital patient assigned her interest in insurance benefits to a hospital to pay for her surgery. *Univ. of Tex. Med. Branch*, 777 S.W.2d at 452. The insurer paid the hospital directly for the surgery but later recovered the payment after determining

---

[5] Act of May 13, 2011, 82d Leg., R.S., ch. 194, § 1, 2011 Tex. Gen. Laws 747.

the surgery was not a necessary medical procedure. *Id.* The patient sued the insurer for the benefits, and the insurer ultimately settled the claim. *Id.* This led the hospital to intervene, believing itself entitled to the settlement proceeds given the assignment. *Id.*

The court agreed with the hospital, explaining that "[t]he assignor, after an unqualified assignment and notice to the obligor, generally loses all control over the chose and can do nothing to defeat the rights of the assignee. . . . [T]he assignment was irrevocable and [the hospital patient] did not have the authority to prejudice or defeat [the hospital's] rights under the assignment." *Id.* at 453. The settlement proceeds were the hospital's all along: the patient merely held them in constructive trust on its behalf. *Id.*

Applying these principles here, an assignor cannot retroactively alter a property right it has already assigned in a manner that prejudices the rights of its assignee. Broadway conveyed an interest in fee simple to John Evers, and John conveyed that same interest to Yates Energy. When John did so, he kept nothing. John therefore had no control over the property interest he sought to modify when executing the correction instrument. Allowing him to defeat the rights of the assignee without consent or even notice is inconsistent with this basic tenet of assignment law.

In sum, even if the statute were unclear about whether John (an original party) can defeat the rights of his assignees by asserting property rights he no longer holds, the common law tells us he cannot. The common-law principle that an assignor loses control over the assigned property informs our construction of section 5.029 and confirms that John ceded all control over the mineral rights when he conveyed his interest to Yates Energy.[6] *See* TEX. GOV'T CODE § 311.023(4).

---

[6] The Legislature has displaced common-law limits on the scope of correction instruments, which we addressed in *Myrad Properties, Inc. v. LaSalle Bank National Ass'n*, 300 S.W.3d 746 (Tex. 2009). We held that correcting the mistaken omission of an entire parcel of land exceeded the narrow scope of the permissible uses of such

11

**III.    The Court's holding allows property owners to be stripped of their land without notice or consent and destabilizes the record title system.**

Finally, if section 5.029 were ambiguous, we should consider the consequences of the competing constructions in deciding whether John can alter mineral rights that no longer belong to him.  *See* TEX. GOV'T CODE § 311.023(5).  The Court declares that property owners can be retroactively divested of land or minerals without prior notice through an agreement between previous owners.  Under the Court's rule, property owners must check public records routinely to see whether they have been stripped of their property and, if they have been, pursue litigation to recover it.

Broadway argues—and the Court agrees—that current property owners will receive protection from section 5.030(c) in these circumstances, but that protection does not alleviate the concerns that property owners must vigilantly inspect public records and pursue costly litigation to right any wrongs.  Section 5.030(c) provides that correction instruments are

> subject to the property interest of a creditor or subsequent purchaser for valuable consideration without notice acquired on or after the date the original instrument was acknowledged, sworn to, or proved and filed for record as required by law and before the correction instrument has been acknowledged, sworn to, or proved and filed as required by law.

But to say that a divested property owner would have a post-deprivation claim to recover its property as a bona fide purchaser does not explain why the owner should have to pursue the claim at all or why the status quo should be altered by stripping the owner of its property while litigation proceeds.

---

a deed.  *Id.* at 750, 753.  In enacting the correction-instrument scheme addressed here, the Legislature broadened that scope to allow for such corrections.  But the Legislature did not displace all common law regarding assignments and conveyances, so the principles addressed here help us discern who can sign a correction deed.

The Court's position places heavy burdens on property owners, but why should the burden be theirs? Current owners can do nothing to avoid the controversy: these parties have no power over the original grant between previous owners or the agreement between them to subsequently alter the scope of the property right. A party should not be burdened to litigate when it has no means of avoiding litigation, especially where the alternative is to place the burden on a party who *can* avoid litigation.

The original grantor and grantee—Broadway and John Evers in this case—could have avoided litigation by taking care with the original instrument. They are the ones who have the power to get it right the first time, and by requiring the current owner's assent to a material correction, they have another incentive to do so. This pressure on the original parties will prevent future litigation. *E.g.*, *Air & Liquid Sys. Corp. v. DeVries*, 139 S. Ct. 986, 997 (2019) (Gorsuch, J., dissenting) ("[T]he traditional common law rule still makes the most sense today. The manufacturer of a product is in the best position to understand and warn users about its risks; in the language of law and economics, those who make products are generally the least-cost avoiders of their risks. By placing the duty to warn on a product's manufacturer, we force it to internalize the full cost of any injuries caused by inadequate warnings—and in that way ensure it is fully incentivized to provide adequate warnings."). Subsequent grantees can do nothing to prevent this problem, so there is nothing to gain from making it their burden.

Also, there is nothing in section 5.030(c) that will lessen each property owner's burden to monitor property records diligently. Instead, owners must do exactly that to receive notice of their divestiture and timely commence litigation so they may ultimately avail themselves of the

13

protections in that section.[7]  Conversely, there is no burden to monitor these records if the current owner must execute the correction instrument.  That burden disappears and the burden to litigate shifts to the original parties, who have the power to shape their behavior to avoid disputes in the first place.

Moreover, the protection that section 5.030(c) provides to assignees—which the Court touts as mitigating the property-stripping impact of its reading of section 5.029—is incomplete at best.  For example, section 5.030(c) does not appear to affect the statute of limitations for adverse possession.  Nor does it say that an assignee who is a bona fide purchaser can recapture any revenue it loses from the property between the date a correction deed strips its interest without notice and the date a court orders that interest restored.[8]  And section 5.030(c) only protects purchasers and creditors, not assignees like John Evers who received their assignments by gift.  Under the Court's holding, a donee who acquires a property interest by gratuitous assignment can be deprived of that property with impunity if the donor and the person from whom the donor originally acquired the property later decide to execute a correction deed.[9]

I also note that my interpretation of section 5.029, which requires assignees to execute a correction deed if it affects their current property interest, does not render section 5.030's limited

---

[7] In addition, under the Court's reading, current owners face the threat of litigation for failure to deliver marketable title when selling land affected by a correction instrument executed between the execution of a land-sale agreement and performance of the sale.

[8] For example, if a mineral interest owner discovered that remote original parties had corrected a deed in its chain of title many years earlier so that it lost part of its interest and thus received no royalties from a well drilled on that part, would its claim to all but the last two years of those royalties be barred by the conversion statute of limitations for personal property? *See* TEX. CIV. PRAC. & REM. CODE § 16.003(a); *Humble Oil & Ref. Co. v. West*, 508 S.W.2d 812, 817 (Tex. 1974).  Section 5.030(c) provides no answer.

[9] For example, if Mary Evers as settlor of the trust and Broadway as trustee later executed a correction deed stating that the property the trust had gratuitously assigned to John was never actually given to the trust by Mary, then John would lose that property.

14

protections for bona fide purchasers pointless. *Cf. ante* at __. Section 5.030 plays an important role by protecting creditors against corrections that are executed after they obtain their security interest in property. In addition, section 5.030 protects assignees who purchase property without notice of an executed but unrecorded correction instrument affecting that property.

I recognize, of course, that the original parties to the deed are likely to have better information about whether it contains a material error that should be corrected, so having them as the default required signers under section 5.029 has appeal from a policy perspective. But when weighed against the fundamental constitutional command that "No citizen of this State shall be deprived of . . . property . . . except by the due course of the law of the land,"[10] it is no wonder that the Legislature made the policy choice grammatically indicated in section 5.029: when an assignment is "applicable," either the assignee must also sign or a court must determine what the original parties' true intentions were.

Amicus Texas Land Title Association raises the concern that current owners who receive property knowing of a material mistake in the original conveyance might thwart the execution of a correction instrument in bad faith. But many holders of property interests will doubtless agree to fair corrections, as happened just this term in *Concho Resources, Inc. v. Ellison*, __ S.W.3d __, __, No. 19-0233, 2021 WL 1432222, at *3 (Tex. Apr. 16, 2021). In any event, the Association's concern is, at bottom, another version of the argument that the burden to litigate should be on current owners. In the scenario the Association envisions, the original grantor can still seek a judicial remedy and establish its equitable title to any property conveyed by mistake. The worst-case scenario from requiring current owners to assent to their divestiture, therefore, is that those

---

[10] TEX. CONST. art. I, § 19.

few who acquired property knowing both a) that there is a material mistake up the chain of title and b) that the mistake has not been corrected must be haled into court.

This is no disaster, especially considering the alternative. First, the consequence the Association raises is that the original parties will have the burden to pursue judicial remedies, but this is preferred when they are the only ones who could avoid mistakes in the first place.

Second, under the Court's rule, it is possible that an original grantor and grantee will execute a correction instrument in bad faith. For example, a grantor and grantee could underprice a land sale between them, have the grantee sell the property to a new buyer for more money, and later execute a correction instrument restoring some of the property to the original grantor. They can do so without notice to or consent from the current owner of the property, whose only protection is a judicial remedy that can be pursued only after careful inspection of local property records. Even if this outcome is unlikely, there is no reason to believe it would be any less prevalent than the scenario Broadway envisions, in which subsequent owners acquired property only to take advantage of a material mistake up the chain of title that had not been corrected. These outcomes are consequences we should consider in construing section 5.029. *See* TEX. GOV'T CODE § 311.023(5).

Far more concerning than the rare party who can identify and purchase property conveyed by mistake in a previous instrument is the threat of divestiture faced by every land and mineral owner in Texas starting today—a threat that cannot be avoided without expensive diligence and judicial relief. To avert this threat, the Texas Title Examination Standards consider a correction instrument that materially alters a prior conveyance effective "only if joined by all parties whose interests are affected." Tex. Title Examination Standards, Standard 2.20, reprinted in TEX. PROP.

16

CODE, tit. 2, app. These standards are not binding, but they are compiled by a board of experts in the title examination field and are intended to state fundamental and enduring principles that establish guidelines for conducting a reasonable and practical title examination. *Id. Preface*. Applied here, Standard 2.20 would require EOG and the other owners of the mineral rights at issue to execute the correction instrument. This standard is suddenly erroneous under the Court's opinion, further highlighting new instabilities within the record-title system. The precariousness of each property owner's title to its land is highlighted by this departure from established title examination practices.

Standard 2.20 expressly mentions sections 5.028 and 5.029 of the Property Code as well as our decision in *Myrad*. *Id*. It was published in 2014—three years after the correction-statute scheme was enacted—and cites section 5.029 to justify its caution that title examiners rely on correction instruments only if affected subsequent purchasers have joined in the execution of the instrument.

\* \* \*

The considered expert judgment of Standard 2.20 confirms that if there is any statutory ambiguity regarding whether EOG and other current interest-holders were required to execute the correction instrument, the statutory scheme as a whole, the effects of the different constructions, common-law principles, and current industry practice all show that their signatures were required. Further, all these considerations align with the plain language of the statute. Because the Court draws the opposite conclusion and allows a prior owner of property to execute a correction instrument that strips the property from its current owner without notice or consent, I respectfully dissent.

_____

J. Brett Busby
Justice

**OPINION DELIVERED:** May 14, 2021